**F I L E D**

**UNITED STATES COURT OF APPEALS**

**February 20, 2007**

**FOR THE TENTH CIRCUIT**

FRED CORLEY,

       Plaintiff-Appellant,

v.

DEPARTMENT OF VETERANS
AFFAIRS, by and through the
Honorable Anthony J. Principi,
Secretary of Veterans Affairs,

       Defendant-Appellee.

No. 05-7137
(D.C. No. 04-CV-482-W)
(E.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **LUCERO**, and **HARTZ**, Circuit Judges.

     Fred Corley appeals the district court's grant of summary judgment in favor

of his former employer, the Department of Veterans Affairs (VA), on his claims

for disability discrimination under the Rehabilitation Act of 1973, 29 U.S.C.

§ 791, and for constructive discharge. He alleges that he has a physical

---

[*]     After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent except under the doctrines of law of the case, res judicata and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

impairment–a seizure disorder–that substantially limits one or more major life activities, and that he is therefore disabled under the Rehabilitation Act. He claims that the VA failed to accommodate his disability and that he was constructively discharged when he chose to pursue retirement benefits rather than accept a demotion to a lower-paid position. We affirm.

## I. Background

Mr. Corley began employment with the VA in 1992. At all times relevant to this case, he was an Education Case Manager (ECM). His job was to communicate with veterans about their education benefits via telephone, email, and faxes, as well as in person either at the VA office or during town-hall meetings. ECMs were required to be available to answer telephone calls from veterans for a large portion of their work days; as of March 2003 the minimum time they were to be available was six hours per day. Any inquiry regarding a specific veteran's education benefits required use of a computer to access the information.

Mr. Corley suffered the first of two major seizures in 2000, while stationed in Turkey on military duty. In January 2001 he suffered a second major seizure at home. He reported to Dr. Edward Moroney, his primary care physician at the Muskogee, Oklahoma, VA Medical Center (VAMC), that he was having seizure-like activity, primarily while he slept, as evidenced by urinary incontinence. Dr. Moroney referred Mr. Corley to a VAMC neurologist and

advised that he should not ship out to Jordan with his Air National Guard unit.

Mr. Corley began seeing Dr. L. Keith Simmons, a private neurologist, in connection with his seizure activity.

On February 1, 2001, Dr. Moroney made the following notation in Mr. Corley's medical file:

> The above referenced individual has developed a seizure disorder which is presently[] controlled [with] medication. However his stress should be kept at a minimum to prevent breakthro[u]gh seizure activity. He should not be required to spend more than 4 h[ou]rs/day on the telephone.

Aplt. App., Vol. I at 109. Mr. Corley presented this document to Phyllis Curtis, one of his supervisors at the VA, on March 22, 2001. Beginning that day he started assisting with training new employees for four hours per day, apparently reducing his available telephone time to at most four hours. Although the need to train new employees was temporary, Mr. Corley had indicated that possibly something could be done medically to control his seizures, so Ms. Curtis understood that Mr. Corley would again be able to perform his regular duties once the temporary assignment was completed.

On March 27, in describing his medical history to Dr. Madhusudan Koduri, a psychiatrist, Mr. Corley reported that once a week or more he was having seizures, during which he sometimes passed out. He also told Dr. Koduri that he was not driving. There are no further notations in Mr. Corley's medical records regarding seizure activity for almost eight months. In November 2001 he

reported to Dr. Simmons an increase in the frequency of his seizures since August but indicated that he had not had any further generalized convulsions. The seizures occurred more at night and were evidenced by urinary incontinence. He also had a few episodes at work when he became glassy-eyed, and on occasion the computer screen would induce a seizure. Dr. Simmons noted that Mr. Corley was on a modified work schedule and recommended that this schedule continue until the seizures were controlled.

Five months later, in April 2002, Mr. Corley reported a decreased frequency of seizure symptoms to Dr. Koduri. In June he reported to Dr. Moroney that he was having seizures once a week during the night. Dr. Moroney noted that Dr. Simmons was changing Mr. Corley's seizure medication. Dr. Simmons provided Mr. Corley with a "return to work" form, at his request, which was effective June 17, 2002. The return-to-work form restricted only Mr. Corley's use of hazardous equipment. The form also indicated that his seizure medication was being adjusted, which could initially result in increased seizures. The parties dispute whether the hazardous-equipment limitation was the only limitation after June 17, 2002, or was in addition to the previous four-hour limitation on telephone work. After Mr. Corley gave the return-to-work form to Ms. Curtis, he continued to work the modified schedule limiting his telephone time to four hours per day. In August 2002 he reported to Dr. Moroney that he had had no more seizures after switching medications. He

asked Dr. Moroney for a letter stating that he was fit for duty with the Air National Guard. That same month, Mr. Corley advised Dr. Koduri that his last seizure had been in May.

In December 2002 Ms. Curtis asked Mr. Corley to provide updated documentation of his medical condition. Mr. Corley sent an email to Dr. Simmons's office on December 18, asking for a currently dated copy of Dr. Simmons's previous note limiting him to four hours of telephone work per day. He told Dr. Simmons that he had had an increase in seizure activity, which seemed to be more prevalent with seasonal or weather changes. He also indicated that he had suffered a midsized seizure at work the previous week and another one the night before. Dr. Simmons faxed back the June 2002 return-to-work form containing only the restriction on use of hazardous equipment, with a note to continue that limitation. Mr. Corley did not provide this return-to-work form to the VA. Instead, upon receiving Dr. Simmons's fax, he sent another email to Dr. Simmons's office on December 19, asking once again for a note limiting his telephone time to four hours per day. Dr. Simmons did not respond. The next day, December 20, Mr. Corley described his seizure spells to Dr. Koduri as intermittent and less intense. He also told Dr. Koduri that he had been playing football occasionally.

On December 31 Mr. Corley contacted Dr. Simmons again, this time asking the doctor to rescind the prior statement limiting him to four hours of telephone

time and to put him back on a regular work schedule. Dr. Simmons released Mr. Corley to a regular work schedule beginning January 2, 2003, with a note to avoid activity that might be hazardous if he loses consciousness. Once again Mr. Corley did not provide this new return-to-work form to the VA.

On January 10, 2003, Ms. Curtis gave Mr. Corley a deadline of January 23 to provide an updated status report from his doctor. She indicated that if he failed to provide the updated information, it would be assumed that he could perform the full duties of an ECM and his schedule would be adjusted accordingly. On January 28, having received no updated documentation, Ms. Curtis returned Mr. Corley to regular duties. On March 18 he was placed on a performance-assistance plan (PAP) because his average daily available telephone time in January and February had been less than six hours. During March and April 2003 he sought medical attention for two knee injuries that he had received playing semiprofessional football. At the April appointment he reported to Dr. Moroney that he continued to have nocturnal urinary incontinence, but it had not increased in frequency since he had started playing semiprofessional football. On May 5 he was taken off the PAP after improving his daily average telephone time to meet the ECM performance standard. In June he sought medical attention again, this time for pain in his arm related to moving furniture the day before. The record suggests that at that appointment he did not report any increase in seizure activity.

On June 29, 2003, Mr. Corley signed an application form seeking disability retirement. He saw Dr. Simmons about a week later, after not having seen him for approximately one year. He reported to Dr. Simmons that his seizures had been doing well until a change in his work schedule. He was now experiencing more frequent seizures and was under a lot of stress. On July 16 he saw Dr. Moroney, reporting continued nocturnal seizures characterized by shaking, urinary incontinence, and post ictal stupor. He indicated that the day after a seizure he was lethargic and that he had been sleeping more. He had not sought medical attention at the VAMC for his seizure activity for over a year.

On July 21, 2003, during a meeting with Francie Wright, the supervisor of his division, Mr. Corley submitted a July 15 statement from Dr. Simmons limiting him to four hours of telephone time per day. In response, Ms. Wright proposed possible alternative computer work he could do for part of the day, but Mr. Corley clarified that it was really the computer, and not the telephone, that caused him problems. He indicated that he would submit another doctor's statement saying so. That same day, he contacted an equal employment opportunity (EEO) counselor at the VA to allege disability discrimination by the VA. He later told the EEO counselor that Ms. Wright had informed him on July 21 that she would put him on a modified work schedule only until October 30, after which he would have to return to his normal ECM duties or take another position that would be a

demotion. The next day, July 22, he submitted to Ms. Wright a return-to-work form from Dr. Simmons, limiting his use of a computer to four hours per day.

Ms. Wright placed Mr. Corley on a modified work schedule on July 30, limiting his computer time to four hours per day. Under the modified schedule the remainder of the day he would be asked to do work that did not involve using a computer, but did involve using a telephone. Ms. Wright indicated that this modified schedule would be limited to 90 days because the noncomputer work was at a lower pay grade than his ECM position. After 90 days he would be expected to return again to his regular ECM duties.

Mr. Corley was awarded full disability-retirement benefits effective October 3, 2003. He stopped having seizures in August or September of 2004 and was seizure-free until at least July 2005.

Mr. Corley filed a complaint against the VA on October 28, 2004. On August 25, 2005, the VA moved for summary judgment on his claims for disability discrimination, retaliation, and constructive discharge. Ruling that Mr. Corley's evidence of intermittent difficulties with major life activities did not establish an impairment that was sufficiently severe and permanent to be a disability, the district court[1] granted the VA's motion on the Rehabilitation Act

---

[1] The parties consented to jurisdiction of a magistrate judge. All references to the district court's order pertain to the November 22, 2005, Order of the magistrate judge.

claims. The district court also granted summary judgment on Mr. Corley's claim for an unpaid performance bonus, which was not addressed in the VA's motion. On appeal Mr. Corley challenges only the summary judgment on his claims for disability discrimination and constructive discharge.

## II. Discussion

### A. Standard of Review

We review the district court's grant of summary judgment de novo. *See Rakity v. Dillon Cos.*, 302 F.3d 1152, 1157 (10th Cir. 2002). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is 'genuine' if a reasonable jury could find in favor of the non moving party on the evidence presented." *Rakity*, 302 F.3d at 1157 (citation omitted). We view the evidence, and draw reasonable inferences therefrom, in the light most favorable to the nonmovant. *Id.* at 1160.

### B. Record on Summary Judgment

We address first a preliminary issue raised by the VA regarding the extent of the record on summary judgment. The VA contends that Mr. Corley improperly included the entire transcript of Dr. Simmons's deposition in the

Appellant's Appendix. We agree with the VA that the full transcript was not before the district court on summary judgment. "[T]he only proper function of a court of appeals is to review the decision below on the basis of the record that was made before the district court." *Allen v. Minnstar, Inc.*, 8 F.3d 1470, 1474 (10th Cir. 1993) (internal quotation marks omitted). Therefore, we will review only the pages of the Simmons deposition transcript that were before the district court: Appellant's Appendix, Volume I at 323-325 and Volume II at 354-356. The remaining pages of that transcript–Appellant's Appendix, Volume II at 364-405–are stricken from the record. *See Aero-Medical, Inc. v. United States*, 23 F.3d 328, 329 n.2 (10th Cir. 1994).

## C. Disability Discrimination

To establish a prima facie case of disability discrimination, Mr. Corley was required to show that (1) he was a disabled person within the meaning of the Rehabilitation Act; (2) he was otherwise qualified for the job; and (3) he was discriminated against because of his disability. *See Woodman v. Runyon*, 132 F.3d 1330, 1338 (10th Cir. 1997).[2] The Rehabilitation Act defines the term *disability* in pertinent part as "a physical or mental impairment that substantially

---

[2]     *Woodman* noted that the same standard for a prima facie case applies in actions brought under the Americans With Disabilities Act (ADA). 132 F.3d at 1338. The standard applied under the ADA is also used to determine whether an act of discrimination violates the Rehabilitation Act. *See* 29 U.S.C. § 791(g); 29 C.F.R. § 1614.203(b). We therefore rely on cases applying the ADA in the course of this order and judgment.

limits one or more major life activities." 29 U.S.C. § 705(9)(B).[3] Although the VA does not dispute that Mr. Corley has a seizure disorder, a physical impairment alone does not make one disabled. The impairment must also substantially limit a major life activity. *See id.*; *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002).

The regulations issued by the Department of Health and Human Services under the Rehabilitation Act define major life activities as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3(j)(2)(ii). This list, however, is not exhaustive. *See Poindexter v. Atchison, Topeka & Santa Fe Ry. Co.*, 168 F.3d 1228, 1231 (10th Cir. 1999). The Equal Employment Opportunity Commission (EEOC) has issued regulations further defining *disability* and *substantially limits*. Because the parties do not dispute their application in this case, we will assume that they should be applied here. *See Toyota*, 534 U.S. at 194. Under these regulations *substantially limits* means:

> (I) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition,

---

3       Mr. Corley does not allege discrimination based on either "a record of such an impairment" or "being regarded as having such an impairment," 42 U.S.C. § 12102(2), both of which are also included in the definition of disability under the Rehabilitation Act, *see* 29 U.S.C. § 794(d); *McGeshick v. Principi*, 357 F.3d 1146, 1150 (10th Cir. 2004).

-11-

manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). The EEOC regulations list three factors to be considered in determining whether an individual is substantially limited in a major life activity: "(I) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id.* § 1630.2(j)(2). "'Substantially' . . . suggests 'considerable' or 'to a large degree.'" *Toyota*, 534 U.S. at 196 (brackets omitted). Thus, "[t]o be substantially limited in a major life activity, 'an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives,'" and the impact of the impairment must "'be permanent or long term.'" *McGeshick v. Principi*, 357 F.3d 1146, 1150 (10th Cir. 2004) (quoting *Toyota*, 534 U.S. at 198).

The district court granted summary judgment in favor of the VA on Mr. Corley's disability-discrimination claim after concluding that his seizure disorder did not substantially limit any major life activity and that therefore he was not disabled under the Rehabilitation Act. Based on our de novo review of the record on appeal, we agree with the district court.

### 1. Major Life Activities

First, we must determine which of Mr. Corley's major life activities are at issue. A plaintiff must articulate with precision the major life activity affected by his impairment. *See Poindexter*, 168 F.3d at 1232. On appeal Mr. Corley contends that 15 different major life activities were substantially limited by his seizure disorder. But his argument below and the district court's decision addressed only seven alleged major life activities. This court will not consider an issue not passed upon below. *See Walker v. Mather (In re Walker)*, 959 F.2d 894, 896 (10th Cir. 1992). Nor will we review an issue not raised in appellant's opening brief. *See State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994). Therefore, we will consider only the five activities that Mr. Corley raised both in his opening brief on appeal and before the district court: sleeping, caring for his children, grocery shopping, operating machinery (such as a lawn mower), and working.

Whether an activity alleged to be affected by an impairment is a "major life activity" under the Rehabilitation Act is a question of law for the court. *See Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003). "'Major' in the phrase 'major life activities' means important. 'Major life activities' thus refers to those activities that are of central importance to daily life." *Toyota*, 534 U.S. at 197 (citation omitted). "A 'major life activity' is a basic activity that the average person in the general population can perform with

little or no difficulty." *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir. 1999). The touchstone of a major life activity is its significance. *See Poindexter*, 168 F.3d at 1231.

The Rehabilitation Act regulations include working as a major life activity. *See* 45 C.F.R. § 84.3(j)(2)(ii). And we have held that sleeping is a major life activity. *See Pack*, 166 F.3d at 1305. Mr. Corley cites no authority to support his contention that operating machinery, caring for his children, and grocery shopping are major life activities. *See Phillips v. Calhoun*, 956 F.2d at 949, 953-54 (10th Cir. 1992) (a party must support its argument with legal authority). The VA asserts, the district court concluded, and we agree, that operating machinery is not a major life activity. *See Weber v. Strippit, Inc.*, 186 F.3d 907, 914 (8th Cir. 1999) (mowing the lawn not a major life activity). It is hardly of central importance in daily life. The district court did not decide whether caring for one's children or grocery shopping are major life activities. But we do not believe that either activity standing alone is sufficiently significant to qualify as a major life activity as compared to the enumerated major life activities under the Rehabilitation Act regulations. *See* 45 C.F.R. § 84.3(j)(2)(ii). Again, neither can be said to be central to daily life. *See Poindexter*, 168 F.3d at 1231; *see also Krauel v. Iowa Methodist Med. Ctr.,* 95 F.3d 674, 677 (8th Cir. 1996) (caring for others is not a major life activity); *Novak v. Principi*, 442 F. Supp. 2d 560, 567 (N.D. Ill. 2006) (same); *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 643 (2d Cir. 1998)

-14-

(mall shopping is not a major life activity); *Turner v. Sullivan Univ. Sys., Inc.*, 420 F. Supp. 2d 773, 784 (W.D. Ky. 2006) (inability to shop for groceries by oneself is not a substantial limitation on a major life activity); *cf. Emory v. AstraZeneca Pharmaceuticals LP*, 401 F.3d 174, 181 (3d Cir. 2005) (considering ability to care for one's children as part of major life activity of performing manual tasks). Thus, we will consider only whether Mr. Corley's seizure disorder substantially limited his two identified major life activities: sleeping and working. (We add, however, that our discussion of these two activities will strongly suggest that Mr. Corley's other alleged major life activities were not substantially limited.)

## 2. Substantial Limitation of Major Life Activity of Sleeping

Mr. Corley asserts that the district court made numerous errors in concluding that his sleeping was not substantially limited by his seizure disorder. He argues that the record does not support the court's conclusions that his seizures and their effects were sporadic, and he claims error in the court's characterization of his problems with sleeping as intermittent and not long-term or severe. More specifically, he argues that the record fails to support the court's determination that he experienced no seizure activity for extended periods of time after receiving medication. He also asserts that the court incorrectly based its no-substantial-limitation conclusion solely on the effects of the two large seizures that he suffered.

Mr. Corley makes two different arguments in support of his claim that his seizure disorder was severe and substantially limited his sleeping. First, he asserts that he experienced frequent, regular seizures over an extended period of time, with resulting permanent or long-term disturbances and substantial effects on his ability to sleep. Alternatively, he contends that evidence of the effects of his seizures during periods of increased seizure activity supports the conclusion that his impairment was severe and substantially limited his ability to sleep. We conclude that his evidence fails to demonstrate a triable issue of fact concerning whether his seizure activity was severe and whether its effects on his ability to sleep were permanent or long-term.

### a. Evidence of Frequent Seizures Over Extended Period

In his appeal brief Mr. Corley repeatedly refers to a 2½-year period during which he experienced one or more seizures per week. These claims of weekly seizures over an extended period of time, however, are not supported by any citation to the record. *See Rakity*, 302 F.3d at 1160 (appellant bears responsibility of providing essential references to record to carry burden of establishing a triable fact issue). And the record indicates otherwise. As Mr. Corley admits, he was seizure-free for several months during this 2½-year period, from either May or June 2002 to August of that year. Although he reported to his doctors having weekly seizures in March 2001 and June 2002, and increases in seizure activity in November 2001 and July 2003, at other times he reported that his seizures were

decreasing in frequency (April 2002) or were intermittent but less intense (December 2002).

Nor did Mr. Corley ever testify to having frequent seizures over an extended period of time that interfered with his ability to sleep. When asked how many total seizures he had experienced, he testified that from 1992 until July 13, 2005 (the date of his deposition), there were 40-50 occasions when he had a seizure that caused him to sleep more than usual. Two of the 40-50 seizures were major ones, after which he slept for up to 12 additional hours. Following the other, nonmajor seizures he slept for an additional three to four hours, or through the morning and into the afternoon. Even if the period during which Mr. Corley experienced the 40-50 seizures did not begin until January 2001, when he first reported seizure activity to the VAMC,[4] and ended in August or September 2004, when he testified that he had stopped having seizures altogether, he still would have suffered, on average, only approximately one seizure per month based on his own testimony, with the resulting effects upon his sleep similarly intermittent.

Mr. Corley is correct that, apart from the period from May to August 2002, there is no evidence to support the district court's conclusion that he was not having seizures at all. But neither is the converse true: there is no reasonable

---

[4] At least one of his major seizures, however, occurred before January 2001. Mr. Corley testified that the first of two major seizures he experienced was while he was deployed with his National Guard unit in Turkey in 2000.

inference from the evidence that his seizures occurred regularly on a weekly basis for a number of years. Notwithstanding the arguments in his brief, his own testimony belies that conclusion. It was his burden to establish the frequency of his impairment. *See Rakity*, 302 F.3d at 1157-58 (when nonmoving party bears burden of proof at trial on dispositive issue, it must go beyond pleadings and designate specific facts to survive summary judgment). Viewing the medical evidence and Mr. Corley's testimony in the light most favorable to him, the record does not establish that on a weekly basis during the last 2½ years of his employment at the VA he experienced seizures causing him to sleep more than usual. We agree with the district court that the evidence establishes only a sporadic or intermittent impairment.

### b. Evidence of Periods of Increased Seizure Activity

Alternatively, Mr. Corley argues that the district court ignored his evidence of periods of increased seizure activity, which, he contends, supports the conclusion that his impairment was severe and substantially limited his major life activity of sleeping. We do not believe that the court ignored this evidence. We conclude, as did the district court, that the evidence is insufficient to establish a triable fact issue regarding whether Mr. Corley's impairment was of such severity and duration that it resulted in permanent or long-term impacts on his sleeping.

Mr. Corley testified that during periods of increased seizure activity he would have three to five seizures per week, after which he would sleep longer,

resulting in disruption to his sleep patterns. His testimony regarding increased seizure activity focused on the period from January 2003 until the time of the alleged discrimination in July 2003. He initially testified that during that period he missed work a minimum of one day per week, and as many as two or three days, as a result of his extended sleeping following seizures during the night. But the evidence reflects that in January 2003 Dr. Simmons provided him, at his request, with a return-to-work form restoring him to his regular work schedule. Moreover, on cross-examination he testified that he began playing semiprofessional football in December 2002 and he acknowledged telling Dr. Moroney four months later, in April 2003, that his seizure symptoms had not increased since he had begun playing semiprofessional football. He ultimately testified that his seizure activity did not increase until April and May 2003. In July 2003 he reported seizure activity to Dr. Moroney and more frequent seizures to Dr. Simmons.

The alleged discriminatory conduct–telling Mr. Corley that his new modified work schedule would be offered for only 90 days–occurred no later than July 30, 2003. Thus, according to Mr. Corley's own testimony, as clarified on cross-examination, his only relevant "period of increased seizure activity" began in April or May 2003 and appeared to continue into July 2003. There is no evidence regarding how long (or whether) that period of increased seizure activity

continued after July. (We do know that Mr. Corley was seizure-free as of August or September 2004.)

Mr. Corley's evidence certainly establishes that at times he experienced more frequent seizure activity. And in the case of the four months before the alleged discriminatory act, his testimony indicates that he was having more seizures than in the preceding months of that year. But the evidence as a whole, including his own testimony about the total number of seizures he experienced during his employment with the VA, does not establish a triable fact issue regarding whether his impairment substantially restricted his sleeping. There is insufficient evidence to support his contention that his impairment resulted in permanent, or even long-term, effects on his ability to sleep as compared to the average person in the general population. As the district court concluded, such intermittent effects on a major life activity are insufficient to establish an impairment that qualifies as a disability. *See Pack*, 166 F.3d at 1306 (affirming grant of judgment as a matter of law when plaintiff's evidence of episodes of sleep disruption failed to establish her problems were severe, long-term, or had a permanent impact); *see also McWilliams v. Jefferson County*, 463 F.3d 1113, 1116-17 (10th Cir. 2006) (affirming summary judgment when evidence showed only intermittent depressive episodes that caused difficulty sleeping and getting along with co-workers) *Croy v. Cobe Labs., Inc.*, 345 F.3d 1199, 1204 (10th Cir. 2003) (affirming summary judgment when plaintiff established only that she was

often temporarily unable to function as the average person would, due to multiple sclerosis).

### c. Evidence of Classification of Mr. Corley as Disabled by Kansas Department of Rehabilitative Services

Mr. Corley also argues that the district court improperly ignored the evidence that he was classified as "disabled" in 2004 by the Kansas Department of Rehabilitative Services. In opposition to summary judgment, he submitted documents, labeled as Exhibit A, purporting to be a certificate of eligibility from Kansas Rehabilitation Services and a brochure titled Rehabilitation Services Handbook of Services. He asserted in the district court that it was undisputed that he had received services from the State of Kansas Department of Rehabilitative Services as a "qualified individual with a disability." The VA did not dispute that Mr. Corley received services, but argued that Exhibit A was inadmissible. On appeal the VA asserts that the district court properly excluded from the record and did not consider Exhibit A, but it includes no citation to the record to support that contention.

We do not reach the question of the admissibility of Exhibit A for summary-judgment purposes because we hold that it is not relevant to the determination whether Mr. Corley was disabled at the time of the alleged discrimination. As Mr. Corley asserts in his appeal brief, his "impairments should be examined at the time the discrimination took place." Aplt. Br. at 12. The Kansas certification is not temporally relevant because it was issued nearly a year after the alleged discrimination. "The determination as to whether an individual is

a 'qualified individual with a disability' must be made as of the time of the employment decision." *Cisneros v. Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000) (internal quotation marks omitted), *overruled on other grounds by Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001). In *Cisneros* we noted that evidence of the plaintiff's inability to work at the time of the lawsuit was not relevant to whether she was a qualified individual with a disability at the time of the alleged discrimination. *Id.* at 1129 n.12. Likewise, a showing that Mr. Corley was disabled in June 2004 is not relevant to establishing whether he was disabled in July 2003.

### d. Factual Dispute Regarding Work Restrictions

Finally, Mr. Corley contends that the facts are in dispute regarding whether the work restrictions placed on him by Dr. Simmons in June 2002 included only avoiding hazardous equipment, or also continued the previous limitation of four hours of telephone work per day. But we do not believe that this dispute involves any material fact which could preclude summary judgment. Even assuming that Mr. Corley's version of his work restrictions as of June 2002 were correct, that fact is not relevant to whether his seizure disorder substantially limited his major life activity of sleeping. *See Rakity*, 302 F.3d at 1157 ("A dispute over a material fact is 'genuine' if a reasonable jury could find in favor of the nonmoving party on the evidence presented."). As we have concluded, Mr. Corley's own testimony regarding the duration and severity of his seizure activity defeats his claim.

-23-

### 3. Substantial Limitation of Major Life Activity of Working

"With respect to the major life activity of working[,] . . . [t]he term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(I); *see Siemon v. AT&T Corp.*, 117 F.3d 1173, 1176 (10th Cir. 1997). The EEOC regulation states that "class of jobs" refers to "jobs utilizing similar training, knowledge, skills or abilities" within "the geographical area to which the [plaintiff] has reasonable access," 29 C.F.R. § 1630.2(j)(3)(ii)(A)-(B); and "broad range of jobs in various classes" refers to "jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area," *id.* § 1630.2(j)(3)(ii)(C). Thus, to be substantially limited in the major life activity of working,

> one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 492 (1999).

Mr. Corley asserts that the district court erred in concluding that his claim failed because (1) he did not present evidence that he was disqualified from other jobs in his geographical area requiring the same skills and abilities that he brought

to the VA, and (2) he did not produce evidence of jobs in his geographical area to which he had access, or the number and type of jobs demanding similar training. He argues that the evidence of his limited ability to perform certain activities is sufficient to establish a triable fact issue regarding whether he was substantially limited in working. Specifically, he claims that the evidence establishes that as a result of his seizure disorder he was foreclosed from jobs involving any of the following activities: driving, operating machinery (including using a lawn mower), childcare, telephone or computer work for more than four hours per day, military service, working at heights, maintenance, and housekeeping.

Mr. Corley misapprehends his burden as the plaintiff. First, he characterizes his enumeration of limitations as "substantial," implying that by its sheer volume the list establishes that he is substantially limited in working. But he is not substantially limited in the major life activity of working if either (1) "jobs utilizing [his] skills (but perhaps not his . . . unique talents) are available" or (2) "a host of different types of jobs are available." *Sutton* 527 U.S. at 492. The limitations he lists hardly compel the conclusion that either (1) or (2) (much less both) has been foreclosed. Second, Mr. Corley chides the district court for not making findings regarding what skills and abilities he brought with him to the VA. But he did not point the district court to any evidence regarding his relevant skills that it should have considered. He likewise fails to point this court to any portion of the record indicating what those specific skills were. Instead he simply

-25-

concludes, without specification, that his relevant skill sets are those of an ECM and the skills he acquired in the military. Third, Mr. Corley fails to point to evidence in the record regarding the availability of jobs for him in his geographic area. Instead, he contends that the VA was required to perform a survey of available jobs at the VA and he criticizes it for failing to do so. As a federal employer the VA would have been required reasonably to accommodate him by identifying positions within the VA or other agencies in which he could have functioned despite his disability. But that duty does not arise until he establishes that he has a disability. *See Woodman*, 132 F.3d at 1337-38 & n.6 (describing heightened duty of federal employers to provide reasonable accommodation). It was not the VA's burden to come forward with evidence of the number and types of jobs available or unavailable to Mr. Corley in his geographic area.

The requirement that the plaintiff produce the necessary evidence "'is not meant to require an onerous evidentiary showing.'" *EEOC v. Heartway Corp.*, 466 F.3d 1156, 1164 (10th Cir. 2006) (quoting EEOC Compliance Manual § 902.4). Mr. Corley was not required to present evidence of a precise number of jobs from which he was disqualified because of his impairment. But in his circumstances he did need to present "evidence of general employment demographics and/or of recognized occupational classifications that indicate the approximate number of jobs (e.g., 'few,' 'many,' 'most') from which [he] would be excluded." *Id.* (internal quotation marks omitted). *See Rakity*, 302 F.3d at 1162 (plaintiff failed to

provide evidence addressing his vocational training, relevant geographic area, or number and type of jobs from which he was disqualified); *Bolton v. Scrivner, Inc.*, 36 F.3d 939, 943-44 (10th Cir. 1994) (same). Mr. Corley produced no such evidence.

Mr. Corley argues that the district court failed to consider his evidence that he missed work frequently after a seizure because he could not wake up, and that this limitation would apply to all job types in all geographic areas. But evidence of frequent unscheduled absences is not sufficient to establish a substantial limitation on the major life activity of working. *See Croy*, 345 F.3d at 1204. Furthermore, as we have concluded based on his own testimony regarding the nature and extent of his seizures and the prolonged sleeping they triggered, his impairment was not sufficiently severe, permanent, or long-term to limit substantially his other identified major life activity of sleeping. We reach the same conclusion regarding the major life activity of working. We agree with the district court that he failed to present sufficient evidence to support his claim that his impairment substantially limited his ability to work.

We hold that Mr. Corley failed to establish a triable issue of fact on the first element of a prima facie case of disability discrimination: that he was a disabled person.

## B. Constructive Discharge

"Constructive discharge occurs when the employer *by its illegal discriminatory acts* has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 534 (10th Cir. 1998) (internal quotation marks omitted, emphasis added). Mr. Corley has failed to establish that he had a disability. Accordingly, his "constructive discharge claim based on disability discrimination [under the Rehabilitation Act] necessarily fails." *Wells v. Shalala*, 228 F.3d 1137, 1146 (10th Cir. 2000); *see also Lanman v. Johnson County, Kan.*, 393 F.3d 1151, 1158 (10th Cir. 2004) (declining to address constructive discharge when plaintiff failed to establish disability under the ADA).

The judgment of the district court is AFFIRMED.

Entered for the Court

Harris L Hartz
Circuit Judge